987 So.2d 364 (2008)
STATE of Louisiana, Appellee
v.
Melvin R. CARTER, Appellant.
No. 43,304-KA.
Court of Appeal of Louisiana, Second Circuit.
June 18, 2008.
*366 Kenota L. Pulliam, F. Edward Mouton, for Appellant.
Paul J. Carmouche, District Attorney, Edward Brossette, John Ford McWilliams, Jr., Assistant District Attorneys, for Appellee.
Before WILLIAMS, STEWART and CARAWAY, JJ.
CARAWAY, J.
After being charged by grand jury indictment with aggravated rape, aggravated kidnaping, and armed robbery, Melvin Carter was convicted following a bench trial of forcible rape. Carter was adjudicated a third felony offender and received a sentence of 42 years at hard labor which was imposed without the benefit of probation or suspension of sentence. Carter appeals his conviction.[1] We affirm the *367 conviction, vacate the sentence and remand for resentencing.

Facts
Between 2:00 and 2:30 a.m. on April 8, 2003, H.W. closed the place of business where she worked as a bartender in north Shreveport and waited for a ride home from her boyfriend. When he did not arrive, H.W. decided to walk home, about a ten mile distance. According to H.W., shortly after she began walking north, a male came up behind her, grabbed her and shoved something "cold and metallic" against the back of her head. The assailant threatened to blow H.W.'s head off if she did not comply with his commands. When H.W. screamed, the attacker tightened his arm around her throat and took her to the edge of a parking lot to a rail that separated the lot from a one-foot drop off. He forced her to the drop-off area and sexually assaulted her.
During this event, a Shreveport police unit pulled into the adjacent parking lot responding to reports from a nearby apartment complex of a woman screaming. The assailant threatened to kill H.W. if she alerted police and, within minutes, the police car departed. The assailant took money from H.W. and left the scene. H.W. denied being under the influence of various drugs which she admitted were in her purse. She denied trading sex for drugs. The victim flagged down a motorist who took her to a gas station where she saw law enforcement vehicles. H.W. approached Sergeant Dale Hubbard of the Caddo Parish Sheriff's Office and reported she was raped. He saw that she was emotionally distraught and her pants were muddy and grass-stained.
In the meantime, the Shreveport police officers who earlier responded to reports of screams observed Carter emerging from a wooded area about a block from the residence where the call was made. The officers stopped Carter and determined he had outstanding warrants; his clothes were muddy with grass and mud stains around the knee. The police found underwear in his back pocket. Carter was arrested for the outstanding warrants and placed on hold after H.W.'s description of her assailant matched Carter's. H.W. identified Carter from a photographic lineup. After a grand jury indictment, Carter was arrested for one count each of aggravated rape, aggravated kidnaping and armed robbery.

Discussion
Carter generally argues that the evidence failed to prove that he forced the victim to have sexual relations or that she was prevented from resisting the act by force or threats of physical violence.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light *368 most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132. This standard, now legislatively embodied in La. C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Parker, 42,311 (La.App. 2d Cir.8/15/07), 963 So.2d 497, writ denied, 07-2053 (La.3/7/08), 977 So.2d 896.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La. App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App. 2d Cir.5/9/07), 956 So.2d 769; State v. Burd, 40,480 (La.App. 2d Cir.1/27/06), 921 So.2d 219, writ denied, 06-1083 (La.11/9/06), 941 So.2d 35.
As applicable to this case, forcible rape is committed when anal, oral, or vaginal intercourse is deemed to be without the lawful consent of the victim when the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape. La. R.S. 14:42.1.
The evidence presented by the state included the testimony of Dr. Keith Elborne, the physician who performed a rape examination on the victim. Dr. Elborne described the victim as visibly shaking, and upset. He observed that she looked "like she had undergone some traumatic experience." Consistent with the victim's claim to have been sexually assaulted, Dr. Elborne found two abrasions on her back and some abrasions on her knee that were fresh. Her genitalia contained grass clippings and a hair that was not hers. He did not find rectal trauma or evidence of sperm, but he took swabs and collected vaginal washings. The sex crime examination kit contained blood and saliva samples of the victim. According to Dr. Elborne, *369 the victim told him she thought that "there might have been a gun placed to her head and that she was forcefully-that the assailant used force in trying to have sex with her." After having his memory refreshed by reading his notes, Dr. Elborne agreed with the victim's statements of vaginal penetration and attempted anal penetration. He also stated that the victim did not appear to be intoxicated or under the influence of drugs.
Corporal Jimmy Evans of the Shreveport Police Department also testified. In the early hours on April 8, 2003, he went to a location on North Market Street responding to a call from a tenant in the neighborhood who heard a female screaming. He and another officer arrived in the vicinity within a couple of minutes, but did not hear screams. They observed Carter emerge from a wooded area about a block from the residence where the call originated. They stopped him and discovered his outstanding warrants. His clothes were muddy. When they patted him down, they found his underwear in his back pocket. He was booked on the outstanding warrant charges.
Sergeant Dale Hubbard of the Caddo Parish Sheriff's Office was at a gas station on Highway 1, a few miles north of the Shreveport city limits when the victim came in and said she had been raped. She was very distraught, her makeup had been running and her clothes were wrinkled. She related that she left her place of employment, Fudds on North Market Street, and was walking home when she was pushed down from behind and forced to have sex. She did not appear to be under the influence of drugs or alcohol.
H.W. testified that on the date of the incident, she worked as a bartender at a business which closes between 2:00 and 2:30 a.m. She testified consistently with the facts noted above regarding the alleged sexual assault. She added that the drop-off where she was raped was grassy, and beyond that it was wooded. The assailant took her clothes off as she lay down on the grassy area, tried to penetrate her anally but could not, and then tried to have oral sex with her. She testified that he was biting her around her vagina and that it hurt very badly. He penetrated her vaginally.
At trial, H.W. admitted possessing drugs in her purse at the time of the attack but denied taking any drugs that night because she was working. H.W. identified Carter in court as the man who raped her. She stated that she had never seen him before that night.
Jennifer Valentine, qualified as an expert witness in DNA analysis, testified that she performed the DNA analysis in this case. When comparing the DNA profile from the sperm fraction in the vaginal swab to the reference sample from the defendant, Valentine determined that the probability of the DNA from the swab coming from someone other than the defendant was one in 31.9 trillion.
Detective Rita Caldwell was the final state witness. She testified that she was the sex crimes detective for the City of Shreveport who interviewed the victim at the hospital. She recounted what the victim told her about the incident and it was consistent with the victim's trial testimony. Caldwell stated that at the hospital, the victim was still shaking and crying. Caldwell indicated that the victim did not seem to be under the influence of drugs or alcohol. Caldwell spoke briefly with the defendant. The next day at the jail she read Carter his rights, spoke with him, and obtained a saliva sample. An audiotape interview was conducted, and the tape reveals that Carter was fully apprised of the rape charge against him. Caldwell also testified that nothing in Carter's taped *370 statement was inconsistent with what the victim told her at the hospital. Caldwell also testified that the victim picked the defendant out of a photographic lineup. At the conclusion of Detective Caldwell's testimony, the state rested.
The defendant presented the testimony of Robert Earl Carter (hereinafter "Robert"), Carter's brother. He testified that on the night of the incident, he dropped Carter off at the bar where the victim worked at approximately 1:45 a.m. The defendant told him that a girl at the establishment owed him money. Robert next heard from his brother the following day and learned he had been arrested. According to Robert, the defendant told him "that it really was, you know, he supposed to been trading sex, I guess, for drugs or whatever, you know, but-or the money or whatever, but he was telling me, you know, that the girl must have got scared and hollered rape...."
Melvin Carter testified on his own behalf. He admitted to a prior burglary conviction, a simple battery conviction and a drug conviction. He stated that on the night of the incident, he went to H.W.'s place of work to pick up some money from her for drugs "that I had credit from somebody for us to get high off of." The victim's boyfriend was supposed to bring her the money, but when he didn't show up, they started walking and the victim showed him a little spot where they sat down and got high from a rock of crack that Carter had with him. Then she had sex with him because she wanted to have sex after they got high. However, she "just started freaking out cause I didn't have no more drugs." Afterwards they went their separate ways. Carter denied having a gun. Carter was asked if he made a statement to police regarding his working on a car earlier on the day of the incident. Carter testified that he had made the statement.
On cross-examination, however, Carter was asked if he made a statement to Detective Caldwell. After he testified that he did not know what she (Detective Caldwell) was talking about, he was asked:
Okay. If she [Detective Caldwell] said you said I went to the service station on North Market, I worked on an '89 Honda Accord at some apartments like going toward Vivian ... I was walking because the starter went down, I was going to Mooretown, I wanted to buy some cigarettes, then the laws pulled up, it was three or four of them, it was on the way up the road, did you make that statement?
In response, Carter admitted making the statement. He also said that he made that statement initially because "I was doing something that wasn't legal with the law system."
After the defense rested, the state recalled Detective Caldwell to the stand in rebuttal. She indicated that Carter made a statement to her (on April 9, 2003) when he was in jail after she advised him of his rights and informed him of the rape charge. Caldwell testified that a summary of the statement was in her reports provided to the defense in discovery.
The state requested permission to play a tape recording of the statement, and defense counsel initially had no objection. In the recorded statement, Carter claimed that he had returned a car he had been repairing to a friend and when the friend could not take him home, he began walking in the area where police found him. He claimed to have gone to a gas station to buy cigarettes and call a cab. Carter told Caldwell that the police arrested him due to outstanding warrants. He explained that he got the mud and grass stains on his clothes when he repaired his friend's *371 car. He denied raping H.W. and never asserted that he participated in any consensual sexual activity before his arrest.
While the tape played, defense counsel complained that the state had failed to disclose any recorded statements of the defendant and asserted that the tape went "way beyond the scope of the summary" in the police reports. The state responded that a summary of the statement in the police reports also indicated that the statement was recorded.
After a sidebar conference, the court agreed that the taped statement should have been provided to the defense and that disclosure at the time of trial was inadequate. Nevertheless, the trial court ruled on the issue as follows:
The balance, however, is in other portions of the police report, everything that this Court has heard so far on the tape was fully and adequately disclosed in a summary. Although it did not mention a recorded statement by the defendant, it mentioned a statement by the defendant. So the information that was on the tape recorded statement that was not included in the summary of the tape recorded statement was not and does not come as a surprise because you were at least provided with this information. Based upon the totality of those situations and the balancing by the Court, the Court feels that although the notice was not adequate for purposes of disclosure, there's no prejudicial effect because everything thus far on the tape was disclosed in some form or fashion.
The state completed the examination of Caldwell before resting. After hearing closing arguments and discussions with counsel, the court ruled:
Based upon the totality of evidence presented in this case, particularly the testimony of the defendant, the judge in this court now renders a verdict of guilty of forcible rape. That's the verdict of the Court.
After viewing the evidence in the light most favorable to the state, we find it sufficient to support Carter's conviction. Overall, the two opposing views of the encounter between Carter and H.W. presented the trial court with a credibility issue. The court's acceptance of the victim's testimony is backed up by other strong evidence of the crime.
The victim testified that Carter had a metallic object that he indicated was a gun and threatened to blow her head off if she did not do what he said. Such threats and Carter's reported chokehold on H.W. would readily explain why she did not scream when the police pulled into the parking lot. This is also adequate to establish the element of force or threats of physical violence. Moreover, the prior report of a woman screaming in the area consistently supports H.W.'s claims.
Despite Carter's claims that he knew the victim, she testified that she had never met the defendant. Ample independent evidence about the victim's highly emotional state and physical response to the events were consistent with her having undergone a traumatic experience. The officers participating in the events unanimously agreed that the victim did not appear to be under the influence of drugs or alcohol.
The trial court's acceptance of this evidence provides sufficient proof that the sexual encounter was perpetrated through force or violence without the victim's consent. With Carter's complete change in his version of the events suggesting his guilt, the trial court reasonably rejected his claim that the victim engaged in consensual sex for drugs. Thus, this argument is without merit.
*372 Carter next argues that the failure of the state to produce the above-reviewed audiotape in discovery violated his right to a fair trial and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A review of Carter's formal assignments of error, however, shows that this issue was not raised by counsel. Allegations of error not embodied in formal assignments of error and appearing for the first time in defendant's brief are not necessarily considered for review. La. C.Cr.P. art. 920; State v. Spears, 350 So.2d 603 (La.1977); State v. Overton, 337 So.2d 1201 (La.1976); See also, State v. Wright, 598 So.2d 493 (La. App. 2d Cir.1992). Nevertheless, because the merits of this Brady claim form a basis of Carter's claim of ineffective assistance of counsel, we will address the issues together.
Based upon this claim of ineffective assistance of counsel, Carter argues that his trial counsel failed to file a motion for a new trial or a motion for a continuance on the alleged Brady violation. He also argues that the trial counsel's decision to call him to testify was clouded by the Brady violation and proved fatal to his defense in view of the trial court's ruling.
A defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution. In assessing a claim of ineffective assistance of counsel, a two-pronged test is employed. The defendant must show that (1) his attorney's performance was deficient, and (2) the deficiency prejudiced him. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Thomas, 43,100 (La.App. 2d Cir.4/30/08), 981 So.2d 850. An error is prejudicial if it was so serious as to deprive the defendant of a fair trial or "a trial whose result is reliable." Strickland v. Washington, 466 U.S. at 687, 104 S.Ct. 2052. To show prejudice, a defendant must demonstrate that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. Strickland v. Washington, supra.
To establish that his attorney was ineffective, the defendant first must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. The relevant inquiry is whether counsel's representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Strickland v. Washington, supra. The assessment of an attorney's performance requires his conduct to be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. State v. Ellis, 42,520 (La. App. 2d Cir.9/26/07), 966 So.2d 139, writ denied, 07-2190 (La.4/4/08), 978 So.2d 325; State v. Gage, 42,279 (La.App. 2d Cir.8/29/07), 965 So.2d 592, writ denied, 07-1910 (La.2/22/08), 976 So.2d 1283.
Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. Strickland v. Washington, supra. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the *373 trial would have been different. Strickland v. Washington, supra; State v. Ellis, supra; State v. Gage, supra. A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice. Strickland v. Washington, supra; State v. Jordan, 35,643 (La. App. 2d Cir.4/3/02), 813 So.2d 1123, writ denied, 02-1570 (La.5/30/03), 845 So.2d 1067.
The election to call or not to call a particular witness is a matter of trial strategy and is not, per se, evidence of ineffective assistance. State v. Butler, 41,985 (La.App. 2d Cir.6/20/07), 960 So.2d 1208, writ denied, State ex rel. Butler v. State, 07-1678 (La.5/9/08), 980 So.2d 685; State v. Lee, 39,969 (La.App. 2d Cir.8/17/05), 909 So.2d 672, writ denied, 06-0247 (La.9/1/06), 936 So.2d 195; State v. Morrison, 32,123 (La.App. 2d Cir.7/22/99), 743 So.2d 232, writ denied, 99-3514 (La.5/26/00), 762 So.2d 1103.
Suppression, by the prosecution, of evidence favorable to an accused upon his request for such evidence, violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, supra; State v. Barker, 628 So.2d 168 (La.App. 2d Cir.1993), writ denied, 93-3194 (La.3/25/94), 635 So.2d 236. The term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence. There are three components of a true Brady claim: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either wilfully or inadvertently; and, (3) prejudice must have ensued. State v. Garrick, 03-0137 (La.4/14/04), 870 So.2d 990. A discovery violation involving the state's failure to disclose exculpatory evidence does not require reversal as a matter of the due process clause unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different result. Id.
La.C.Cr.P. art. 716 generally obligates the state, on defense motion, to produce any written or recorded statements or confessions made by the defendant in connection with the case that are within the possession or knowledge of the prosecutor, and that are intended for use at trial. In the event of a discovery violation, the court has the discretion to permit the discovery of the undisclosed material, order a mistrial, grant a continuance, prohibit the introduction of the undisclosed material, or any other order, except dismissal, that is appropriate. La.C.Cr.P. art. 729.5.
Not every failure by the state to comply with these rules automatically requires a reversal. Only when such a failure results in prejudice to the defendant does it constitute reversible error. In the event of the state's failure to comply with the discovery rules, it must be determined whether the defendant was actually prejudiced by the nondisclosure and whether the trial court abused its discretion. State v. James, 38,353 (La.App. 2d Cir.5/12/04), 873 So.2d 858. It is only when the defendant is lulled into a misapprehension of the strength of the state's case through the prosecution's failure to disclose timely or fully, and the defendant suffers prejudice when the undisclosed evidence is used against him, that basic unfairness results which constitutes reversible error. State v. Allen, 94-2262 (La.11/13/95), 663 So.2d 686. The effects of a discovery violation may be remedied by effective cross-examination. State v. James, supra.
The record shows that Carter sought discovery from the state including written *374 or recorded statements made by the defendant. The trial transcripts and record show that the state's response to this request was to provide police reports which contained only a summary of Carter's statement. Detective Caldwell initially referred to Carter's statement in her testimony. The written police report made no mention of the statement being recorded. The trial court correctly concluded that a violation of the discovery rules had occurred. Nevertheless, the record clearly shows that an overall summary of the statement was provided to the defense. That summary, which revealed no claim by Carter on the day following his arrest of consensual sex was contrary to Carter's version of the events about which he chose to testify at trial. That contradiction of events being known by the defense, trial counsel was not surprised by the purported information heard on the tape at trial. Indeed, upon the direct examination of the defendant, Carter's counsel examined Carter about his knowledge of the statements made to police. Counsel asked Carter if he "told the police that you had been working on a car ...?" Carter admitted that he made the statement. Because Carter had admitted that he made the statements, the use of the whole statement by the state was harmless.
Because there was no actual prejudice demonstrated by Carter in the discovery violation, Carter has failed to show that counsel's performance was constitutionally deficient. Furthermore, the choice to call the defendant to testify was a matter of trial strategy made with the knowledge of Carter's prior contradictory statement provided in discovery and cannot be said to manifest ineffective assistance. Given the convincing evidence against the defendant that plainly showed he had intercourse with the victim at an unusual place, and the fact that he was the only other eyewitnesses to the charged crime, counsel could have easily concluded that Carter's testimony was essential to counter the victim's testimony that intercourse was not consensual. With the required deference to trial counsel's tactical decision, and the presumption of the reasonable exercise of professional judgment, the defendant has not shown that trial counsel's performance was deficient. Thus, this assignment of error lacks merit.
Upon error patent review, we note that the trial court imposed Carter's sentence without benefit of probation or suspension of sentence under La.R.S. 15:529.1(G), but noted that under the statute, Carter would be eligible for parole. Nevertheless, because the underlying offense of forcible rape requires that at least two years of the sentence be served without benefit of parole, the habitual offender sentence is to likewise be imposed without parole. State v. Davenport, 43,101 (La.App. 2d Cir.3/19/08), 978 So.2d 1189; State v. Thomas, 42,322 (La.App. 2d Cir.8/15/07), 962 So.2d 1119. Thus, Carter's sentence is illegally lenient. Because the language contained in La. R.S. 14:42.1 requires an exercise of sentencing discretion, it is necessary that we vacate the sentence and remand for resentencing, specifically for a determination of that portion of the sentence to be served without benefit of parole. State v. Hopson, 39,570 (La.App. 2d Cir.4/6/05), 900 So.2d 237.

Conclusion
For the foregoing reasons, Carter's conviction is affirmed. His sentence is vacated and the matter remanded for resentencing in accordance with this opinion.
CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING.
NOTES
[1] Carter's motion to reconsider sentence was denied on September 12, 2006, and his motion for appeal was filed on July 5, 2007. In accordance with La.C.Cr.P. art. 914(B)(2), a motion for appeal must be made no later than 30 days from "the ruling on a motion to reconsider sentence." Thus, the motion to appeal appears to have been filed late. There is no need to remand pursuant to State v. Counterman, 475 So.2d 336 (La.1985), because the trial court granted Carter's motion for appeal, the state did not complain about the procedural irregularity, and appeal dismissal would prolong the delay without serving any useful purpose. See State v. Wagner, 07-0860 (La.3/14/08), 976 So.2d 706.